PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 03-9000 & 03-9001
_____

DAVID C. COPENHEFER,
                    Appellee/Cross-Appellant

v.

MARTIN HORN, Commissioner, Pennsylvania Department
of Corrections; PHILIP JOHNSON, Superintendent of the
State Correctional Institution at Greene;
JOSEPH MAZURKIEWICZ, Superintendent of the State
Correctional Institute at Rockview,
                    Appellants/Cross-Appellees
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 99-cv-00005E)
District Judge:  Honorable Maurice B. Cohill, Jr.
_____

Argued May 3, 2012

Before:  McKEE, Chief Judge, AMBRO and BARRY,
Circuit Judges

(Opinion filed: September 27, 2012)

John H. Daneri, Esq. (*ARGUED*)
Erie County Office of District Attorney
140 West 6th Street
Erie, PA 16501

*Counsel for Appellants/Cross-Appellees Martin Horn,
Philip Johnson, Joseph Mazurkiewicz*

Matthew C. Lawry, Esq. (*ARGUED*)
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106

*Counsel for Appellee/Cross-Appellant David C. Copenhefer*

_____

OPINION OF THE COURT

_____

*BARRY*, Circuit Judge

## I.  Introduction

The Commonwealth appeals the order of the District Court granting David Copenhefer habeas relief from his sentence of death, and Copenhefer cross-appeals the District Court's denial of habeas relief with respect to his conviction. We will reverse to the extent that the District Court vacated Copenhefer's sentence of death, and affirm to the extent that it otherwise denied Copenhefer relief.

## II. Procedural History

In March 1989, David Copenhefer was convicted in the Court of Common Pleas, Erie County, Pennsylvania, of first-degree murder, kidnapping, unlawful restraint, attempted robbery, attempted theft by extortion, and terroristic threats. The penalty phase began shortly thereafter, with the jury finding, as to the murder conviction, two aggravating circumstances and no mitigating circumstances. Based on the jury's finding, a sentence of death was mandatory under Pennsylvania law. At the subsequent sentencing hearing, the court imposed the death sentence fixed by the jury, and consecutive sentences totaling twenty to forty years on the remaining counts. On appeal, the Supreme Court of Pennsylvania affirmed the conviction and sentence. *Commonwealth v. Copenhefer*, 587 A.2d 1353, 1354-55 (Pa. 1991). Copenhefer then filed a petition pursuant to

Pennsylvania's Post Conviction Relief Act (PCRA). The trial court denied the petition, and the Supreme Court again affirmed. *Commonwealth v. Copenhefer*, 719 A.2d 242 (Pa. 1998).

In December 1999, Copenhefer filed a petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Pennsylvania. He withdrew a second PCRA petition after the Commonwealth agreed to waive the exhaustion of state court remedies with respect to the claims in his § 2254 petition, and a third PCRA petition was dismissed as untimely.

The Magistrate Judge, in an extensive Report and Recommendation (App. 42-157), recommended denying relief with respect to the conviction, but granting relief from the sentence of death on the ground that the trial court failed to instruct the jury that it was required to find that Copenhefer's lack of a prior criminal record constituted a mitigating circumstance. The District Court, finding the objections of the parties to be without merit, adopted the Report and Recommendation as the Opinion of the Court, vacated Copenhefer's sentence of death, and denied relief with respect to his conviction. Both parties appealed. We granted Copenhefer a certificate of appealability with respect to his claim that trial counsel rendered ineffective assistance by failing to challenge the Commonwealth's theory that the victim lingered before dying and his claim that the Commonwealth exercised peremptory strikes to remove female jurors in violation of *J.E.B. v. Alabama*, 511 U.S. 127 (1994).[1]

## III. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 2254, and we have appellate jurisdiction under 28 U.S.C.

---

[1] The case was first argued before us in June 2005, following which we stayed the appeal pending the decision of the Supreme Court of Pennsylvania on Copenhefer's appeal from the dismissal of his third PCRA petition. In December 2007, that dismissal was affirmed. *Commonwealth v. Copenhefer*, 941 A.2d 646 (Pa. 2007). We ordered supplemental briefing and we again heard argument prior to rendering this decision.

§§ 1291 and 2253. Because the District Court did not hold an evidentiary hearing, our review of its legal conclusions is plenary. *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2241 *et. seq.*, habeas relief cannot be granted on a claim that was adjudicated on the merits in state court unless the adjudication resulted in a decision that was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). If the state court did not reach the merits of a claim, these deferential standards do not apply. *Holloway v. Horn*, 355 F.3d 707, 718 (3d Cir. 2004).

## IV. Factual Background

In affirming the conviction and sentence on direct appeal, the Supreme Court of Pennsylvania accurately summarized the complicated facts of the kidnapping/murder scheme now before us, and the overwhelming evidence that supported the verdict:

> On June 16, 1988, Sally Weiner received a telephone call purportedly from a congressman's office asking that she meet with the caller to discuss arrangements for the presentation of a civic award to her husband. The next day, around noon, she drove to the agreed meeting place, parked her car, and was never seen again alive. Several hours later, her husband, Harry, manager of the Corry office of Pennbank, received a telephone call playing a recorded message from his wife telling him she had been kidnapped and that the kidnapper demanded ransom money from the bank. Mr. Weiner was directed to retrieve a duffel bag from the parking lot outside his bank; the bag contained additional threats and instructions. Mr. Weiner called a vice president of the bank, as well as the bank's security office, local police, state police, and the FBI. Mr. Weiner

never received the additional radio instructions necessary to follow the directions contained in the duffel bag and therefore did not comply with the kidnapper's demands.

Sally Weiner's body was discovered two days later on June 19, 1988, in a rural area north of her home. She had died as the result of a gunshot wound to the back of her head.

Initial investigations by the FBI, state police, and local police resulted in the discovery of a series of computer-generated notes and instructions, each one leading to another, which had been concealed at various hiding places in and around Corry, Pennsylvania. The investigation also produced several possible suspects, including appellant, David Copenhefer, who owned a nearby bookstore, had had unproductive transactions with Mr. Weiner's bank, and apparently had bad personal relations with the Weiners.

An examination of trash discarded from appellant's store revealed drafts of the ransom note and directions. Subsequent search warrants resulted in seizure of incredibly comprehensive evidence against appellant. This included evidence tying appellant's fingerprints, computer, weapons and ammunition, clothing, automobile, and materials from his home and office to the victim or the murder site.

His fingerprints appeared on the original ransom note and on some of the hidden notes. Police discovered rough drafts of the ransom note, a map of the hidden notes, as well as the notes and directions themselves in apellant's handwriting, some of which bore his fingerprints. Appellant had a collection of guns, including two which might have fired the fatal bullet. He also had glazier ammunition, a nonstandard composition designed to fragment

on impact so that after entering a body it will not exit and injure another person, of the type used to murder Mrs. Weiner. A metal rod from his home had been used to secure one of the hidden notes. Crepe paper torn from a roll at his store had been used to help secure another note. Human female skin tissue was found on his clothing. Tread marks matching appellant's automobile tires were found at one hiding place and at the murder scene. Finally, appellant's computer contained a series of drafts and amendments of the texts of the phone call to Mrs. Weiner on Thursday, the phone call to Mr. Weiner on Friday, the ransom note, the series of hidden notes, and a twenty-two point plan for the entire kidnapping scheme.

*Copenhefer*, 587 A.2d at 1354-55.

## V.  Discussion

### A.  The Commonwealth's Appeal

Adopting the Report and Recommendation of the Magistrate Judge, the District Court concluded that the stipulated fact that Copenhefer had no prior criminal record constituted a mitigating circumstance as a matter of law, and the failure of the trial court to so instruct the jury and the jury to find it as such violated the Eighth Amendment. The District Court vacated the sentence of death, and the Commonwealth appeals. We will reverse.

At the outset, we set forth the rather extensive background of what brings us to this point. At the start of the penalty phase, the trial court gave preliminary instructions to the jury with respect to aggravating and mitigating circumstances, describing in a general sense what they are—those things, for example, about the murder and the murderer that make the case more terrible or less terrible and more or less deserving of the death penalty—and also those specific aggravating and mitigating circumstances at issue in this case that are listed in the Pennsylvania Sentencing Code. As relevant here, "[m]itigating circumstances spelled out in the

Statute ," the court told the jury, "would be when the killer has no significant history of prior criminal convictions." App. 4456; *see* 42 Pa. C.S. § 9711(e)(1) ("mitigating circumstances shall include . . . [that] the defendant has no significant history of prior criminal convictions."). Also, the jury was told, it may consider "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense." *Id.* Defense counsel and the Commonwealth then orally advised the jury that they had entered into a stipulation that Copenhefer had no prior criminal convictions.

Mrs. Copenhefer and the Copenhefers' son took the stand and testified as to their relationships with Copenhefer and his involvement in the church and community. Counsel thereafter gave their closing arguments, with defense counsel arguing that several mitigating circumstances had been established: Copenhefer's relationship with his son, his relationship with his wife, that he did not abuse drugs or alcohol, that he had never physically abused his wife, the importance of religion to him, his intelligence and ability to assist other inmates, that he helped his parents with their meat business, his good behavior during trial, and the value of his life to his family. With respect to the lack of a criminal record, counsel argued:

> Now, with regards to the one mitigating circumstance, which we've already referred to, the fact that he has no prior convictions, [the prosecutor] stood up and stipulated to that, and I suggest to you that speaks for itself. In other words, we have established that clearly that mitigating circumstance exists. And that, therefore, you should take that directly into consideration in making your determinations.

App. 4471. Relying on the evidence presented at trial, the Commonwealth sought to establish the aggravating factors that Mrs. Weiner was held for ransom and the murder was committed during the course of a felony. *See* 42 Pa. C.S. § 9711(d)(3) &(6).

Following the closing arguments of counsel and in

anticipation of the final instructions it would give the jury, the trial court discussed with counsel whether it should or should not direct the jury to find as a matter of law that the stipulated fact that Copenhefer had no prior record was a mitigating circumstance. The Commonwealth argued that the weight of the fact that Copenhefer had no prior record, i.e. whether that fact rose to the level of a mitigating circumstance, remained for the jury to decide—the stipulation that there was no prior record was not, it was argued, a stipulation that no prior record constituted a mitigating circumstance. Defense counsel argued that whatever the weight of the fact of no prior record, it was a proven mitigating circumstance by virtue of the stipulation. The trial court agreed with the Commonwealth, and proceeded to give its final instructions to the jury, clearly and thoroughly explaining, among other things, what, if proven in accordance with the appropriate standard of proof, would constitute aggravating and mitigating circumstances including, as relevant here, "the following matters" under the Sentencing Code: "First, the defendant has no significant history of prior criminal convictions; and, second, any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense." App. 4507. There were no objections to the instructions, nor any suggestions for corrections or additions.

We quote at some length from the trial court's final instructions, and particularly its thorough explanation of mitigating circumstances, to provide context for the legal analysis to which we will shortly turn our attention.

> [A] mitigating circumstance may arise from any of the diverse frailties of mankind. Mitigating circumstances are any facts relating to the defendant's character, education, environment, mentality, life and background, or any aspect of the crime itself which may be considered extenuating, or as reducing his moral culpability, or making him less deserving of the extreme punishment of death. You may consider as mitigating circumstances any circumstance which tends to justify the penalty of life imprisonment.

*   *   *

In this case, under the Sentencing Code, the following matters, if proven to your satisfaction by a preponderance of the evidence, can be mitigating circumstances:

First, the defendant has no significant history of prior criminal convictions; and, second, any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense.

*   *   *

[E]ach of you is free to regard a particular mitigating circumstance as present despite what other jurors may believe. This difference treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives a defendant the full benefit of any mitigating circumstances.

*   *   *

You must consider all evidence of mitigation. The weight which you give to a particular mitigating circumstance is a matter for your moral, factual, and legal judgment. However, you may not refuse to consider any evidence in mitigation which has been proven to your satisfaction by a preponderance of the evidence. I charge you that you must consider the mitigating circumstances offered by the defendant. This does not mean that you must accept them as mitigating circumstances, for you shall only do that if one or more of you determines that those mitigating circumstances have been proven by a preponderance of the evidence.

The list of mitigating circumstances

offered cannot limit your deliberations, since you are free to consider any aspect of the crime or of the character of the defendant as mitigating in your sole discretion.

App. 4505, 4507-10.

The jury commenced its deliberations, reaching its verdict a few hours later. Prior to the announcement of the verdict, the trial court reviewed the verdict form, and noted that it had not been filled out correctly, twice handing it back to the foreman for correction. When the form was initially reviewed, the words "first offense" had been written in by the jury in response to the question of whether a mitigating circumstance had been found by one or more of the jurors. The form was, however, missing a check mark in the box indicating whether the aggravating circumstances unanimously found outweighed that one mitigating circumstance, and the form was, therefore, returned to the foreman. The foreman crossed out "first offense," but mistakenly placed the check mark in the "weighing" box where, given the crossout indicating that no mitigating circumstance had been found, it should not have been placed. The form was again corrected and, as finally returned, clearly showed, and the foreman announced, that the jury found the sentence to be death on the basis that there was at least one aggravating circumstance and no mitigating circumstance. Each juror, when polled, agreed. The verdict mandated a sentence of death under 42 Pa. C.S. § 9711(c)(1)(iv) ("the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance.").

Relying only on Pennsylvania caselaw and statutes, Copenhefer argued on direct appeal that the trial court erred by refusing to instruct the jury that his lack of a prior record was a mitigating circumstance as a matter of law. However, the Supreme Court of Pennsylvania found:

The verdict slip . . . indicates clearly that the jury did consider evidence of mitigation--viz., that appellant had no significant history of prior criminal convictions. Any apparent confusion

in the proceedings has to do with filling out the verdict slip, and the colloquy which occurred when the jury returned its verdict did not clarify the process. But it is readily apparent that the jury did follow the court's instructions in considering appellant's lack of a prior record during its deliberations.

*Copenhefer*, 587 A.2d at 1360. The Court addressed the issue as a matter of state law, and concluded that the sentence was not the product of passion, prejudice, or any arbitrary factor.

In *Commonwealth v. Rizzuto*, 777 A.2d 1069 (Pa. 2001), however, the Supreme Court of Pennsylvania overruled its decision in *Copenhefer* and held that where the absence of prior convictions is not in dispute, the jury has no discretion not to find that absence as a mitigating circumstance. The Court noted that

[i]f we would grant the jury discretion to ignore stipulations of fact, we would be granting the right to arrive at a sentencing verdict in an arbitrary and capricious fashion. Such a conclusion would undercut the very purpose of the death penalty sentencing scheme as developed by our General Assembly. A sentence of death cannot be "the product of passion, prejudice or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3)(i).

*Id.* at 1089. Copenhefer filed a third PCRA petition and raised a state law claim based on *Rizzuto*, a petition denied as untimely. The Court affirmed the denial, stating: "[W]e used the 'arbitrary and capricious' language in *Rizzuto* to indicate the danger of 'undercut[ting] the very purpose of the death penalty sentencing scheme as developed by our General Assembly.' We did not expressly discuss the United States Constitution or any constitutional rights." *Commonwealth v. Copenhefer*, 941 A.2d 646, 650 n.7. (Pa. 2007) (citation omitted). Thus, Copenhefer's third PCRA petition did not fit into the exception to the PCRA's limitations period for newly created, retroactively applied constitutional

rights.  *Id.* at 650. [2]

The District Court reviewed the Eighth Amendment claim *de novo* after concluding that on direct appeal the Supreme Court of Pennsylvania had not even mentioned any such claim, much less decided one on the merits.  We agree with the District Court that review of this claim is *de novo* given that the only claim on direct appeal was based solely on state law.  The federal claim was not, however, defaulted because the Commonwealth waived exhaustion.

The Commonwealth argues that the jury initially found the mitigating circumstance of Copenhefer's lack of a prior record when it wrote on the verdict form, though later crossed out, "first offense," and that any confusion occurred only when the trial court tried to clarify the form.  Whatever merit there may be to that argument and whether confusion may have preceded the jury's ultimate announcement that no mitigating circumstance was found, we are bound by that finding.  Even on that understanding, however, there was no constitutional error.

*Buchanan v. Angelone*, 522 U.S. 269, 272-73 (1998), which held that the Eighth Amendment does not require a capital jury to be instructed on the concept of mitigating evidence generally or on particular statutory mitigating factors, resolves the issue before us.  In *Buchanan*, the jury was instructed that if it found that petitioner's conduct in committing the murders was outrageously vile, it could sentence him to death.  If, however, it believed from all the evidence that the death penalty was not justified, it could sentence him to life imprisonment.  Petitioner requested additional instructions on four mitigating factors that were specifically listed in the Virginia Code.  The trial court refused to give the instructions.  On its verdict form, the jury indicated that it had considered the evidence in mitigation and unanimously fixed the penalty at death.

[2] In addressing the District Court's jurisdiction over the sentencing claim, Copenhefer conceded, "*Rizzuto* does not contain **any** discussion of the Eighth Amendment issues raised in Claim III of the petition." Pet. Mem. Addressing Jurisdiction at 6 (emphasis in original).

Petitioner argued to the Supreme Court that the Eighth Amendment required the trial court to "instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State." *Buchanan*, 522 U.S. at 275. The Supreme Court rejected the argument, observing that, "[n]o such rule has ever been adopted by this Court." *Id.* It explained that, in the selection phase of the capital sentencing process, it has "emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination," and "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Id.* Its "consistent concern" has been that the jury not be precluded from being able to give effect to mitigating evidence—it has "never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence." *Id.* at 276. The Court emphasized that the standard was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* (*quoting Boyde v. California*, 494 U.S. 370, 380 (1990)).

Copenhefer does not argue, nor could he credibly do so, that the jury was not given extensive instructions on the concept of mitigating evidence generally or that it was not instructed on the particular statutory mitigating circumstance at issue here—his lack of a prior record; indeed, one could well make the case that that is game, set, and match given the holding of *Buchanan*. Rather, Copenhefer argues only that the jury should have been instructed to find that the stipulated fact that he had no prior record was, as a matter of law, a mitigating circumstance.[3]

In support of his argument, Copenhefer cites *Eddings*

---

[3] In *Buchanan*, the Virginia Code at issue stated that mitigating circumstances "may include" the lack of a significant criminal history. Here, the Pennsylvania Code uses the mandatory language "shall include." This difference in state law is, of course, not dispositive as to the constitutional issue before us.

*v. Oklahoma*, 455 U.S. 104 (1982), and *Penry v. Lynaugh*, 492 U.S. 302 (1989), which require the jury to "give effect to" the mitigating evidence, and he emphasizes the following language from *Penry*: "*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Penry*, 492 U.S. at 319. As did the District Court, Copenhefer reads the language "give effect to" in this passage as being modified only by "must"—"[t]he sentencer must also [] give effect to that evidence in imposing sentence," i.e., must find it to be a mitigating circumstance. We conclude, however, that the phrase "be able to" modifies "give effect to" as well as "consider," i.e., "[t]he sentencer must also be able to consider and [be able to] give effect to that evidence in imposing sentence." The facts of *Penry* and *Eddings* and, of course, the facts and holding of *Buchanan* clearly support our conclusion.

We but briefly address *Penry* and *Eddings* and then only to show how distinguishable they are on the facts from the case at hand. In *Eddings*, the trial court, as the sentencer, found that it could consider the age of the capital defendant as a mitigating factor but determined that, as a matter of law, it could not consider his family history. Similarly, the state appellate court appeared to consider evidence as mitigating only when it would support a legal excuse from liability. The Supreme Court found that these restrictions violated *Lockett v. Ohio*, 438 U.S. 586 (1978):

> Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

*Eddings*, 455 U.S. at 113-14. (emphasis in original). Here, the jury was not instructed to disregard Copenhefer's lack of a prior record or to give it no weight—indeed, quite the contrary was instructed—and there is no evidence that the jury refused to consider it.[4] Although the jury did not ultimately find a mitigating circumstance, the record strongly suggests that it considered the mitigating evidence and decided that none of that evidence was qualitatively sufficient to constitute a mitigating circumstance.

In *Penry*, the jury was given three special questions, and if it answered all of them in the affirmative, the trial court was required to sentence the defendant to death. The questions concerned whether the conduct of the defendant was deliberate, whether he posed a continuing threat to society, and whether his conduct was an unreasonable response to provocation by the victim. The Supreme Court noted that "[t]he jury was never instructed that it could consider the evidence offered by Penry as mitigating evidence and that it could give mitigating effect to that evidence in imposing sentence," *Penry*, 492 U.S. at 320, and determined that the jury, confined to the three questions posed to it, had not been empowered to give effect to Penry's mitigating evidence in answering the special questions.

> In the absence of jury instructions defining "deliberately" in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue.

---

[4] That the jury initially wrote down "first offense" instead of "no significant history of prior criminal convictions" indicates that it heard and remembered the stipulation and the defense argument that Copenhefer had no prior convictions (as opposed to some insignificant ones); notably, it did not just copy what was listed on the verdict form as one of the potential mitigating circumstances.

*Id.* at 323. The Court then discussed the other two special questions and concluded that "a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.* at 326. Aside from its facts, the lesson of *Penry* is that the jury must *be able* to give effect to the mitigating evidence; it is not *required* to do so.

Here, as in *Buchanan,* the jury was not only *not* precluded from considering Copenhefer's lack of a prior record or any other mitigating evidence, but it was instructed that it *must* consider the mitigating evidence, and no constraint was placed on the manner in which it could give effect to that evidence. Had the jury been of the view that, based on the mitigating evidence, Copenhefer did not deserve to be sentenced to death, it was fully empowered to find that his lack of record, or any other mitigating evidence presented, constituted a mitigating circumstance, weigh that circumstance or those circumstances against the aggravating circumstances, and sentence him to life imprisonment. But in no way was the evidence "exclu[ded] from meaningful consideration by the jury." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 250 (2007). To the contrary, Copenhefer's jury was "permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Id.* at 260. And, as the Supreme Court reiterated in *Buchanan*, "complete jury discretion is constitutionally permissible." 522 U.S. at 276 (citation omitted).

Parenthetically, it is difficult for us to imagine that the outcome in this case would have been different even if the jury had been specifically instructed to find that Copenhefer's lack of a prior record was a mitigating circumstance. As it was, the jury was instructed that each juror was free to find for himself or herself that a mitigating circumstance was present despite what the other jurors believed. Thus, the verdict rendered by Copenhefer's jury indicates that not a single juror believed that his lack of a prior record—or, indeed, any of the many potential mitigating factors argued by defense counsel—mitigated the painstakingly planned murder about which the jury heard at trial.

For the reasons we have stated, we simply cannot conclude that Copenhefer has established any likelihood, much less a reasonable likelihood, that the jury applied the instructions—or, more precisely, as in *Buchanan*, the lack of an instruction—in a way that violated the Eighth Amendment. Because the District Court erred in finding an Eighth Amendment violation, we will reverse its order vacating the sentence of death.

## B. Copenhefer's Appeal

### 1. Ineffective Assistance of Counsel

We granted a certificate of appealability on Copenhefer's claim that his trial counsel provided constitutionally ineffective assistance by failing to call an expert witness to rebut the Commonwealth's evidence that Mrs. Weiner did not die immediately upon being shot but, rather, "lingered" before dying. The District Court rejected that claim. We do so as well.

Mrs. Weiner was last seen early on a Friday afternoon in June 1988. Dr. Antonio I. German, a clinical pathologist, testified on behalf of the Commonwealth that she had died at some point between midnight on Friday and 2 p.m. on Saturday. He also testified that it was possible that her brain stem was not completely destroyed by the gunshot and that it was probable that she lingered in a coma before dying. Dr. K. C. Kim, a forensic entomologist, testified—also for the Commonwealth—that, based on insect activity on the body, Mrs. Weiner died between 5 p.m. and 8 p.m. on Friday. Detective Mark Watts testified for the Commonwealth, as well, relating a conversation he had with Copenhefer not long before trial in which Copenhefer told him that he demonstrated to other inmates how to shoot a person in the head without severing the medulla so that the person does not die right away. During closing arguments, the Commonwealth cited the testimony of both Dr. German and Dr. Kim to argue that Copenhefer shot Mrs. Weiner on Friday afternoon and she lingered before dying between 5 p.m. and 8 p.m. In his closing, Copenhefer's trial counsel argued that Copenhefer had an alibi starting at 5 p.m., when he returned to his bookstore.

Copenhefer raised this ineffectiveness claim in his first PCRA petition. At the PCRA hearing, his trial counsel testified that he had reviewed the medical records in the case and read quite a bit about forensic pathology, time of death, and how fruit flies grow. He stated that he tried to show at trial that Dr. Kim's testimony was inaccurate, and explained that Dr. German's testimony was beneficial to the defense because he placed the time of death on Saturday, when Copenhefer had an alibi. Given that, counsel stated, there was no reason, particularly in the midst of trial, to find a defense expert. Indeed, it was during trial when Dr. German first mentioned the possibility that Mrs. Weiner lingered before dying, and there does not appear to be any evidence that counsel was, or should have been, aware before trial that Dr. German would testify about this theory. Counsel explained that

> all of the reports we had from him indicated that the time of death was at a certain period of time and that that was consistent with the shooting. That being the case, [Dr. German's] testimony was beneficial to the defense because it was consistent with when Mr. Copenhefer could not have done what he is accused of doing. It was not until [Dr. German] indicated that it's possible that she could have lingered, and that was during his trial testimony, as I recall, and not prior to that.

Supp. App. at 141. Copenhefer presented the testimony of Dr. Cyril Wecht, a forensic pathologist, who testified that the medulla was not intact and that Mrs. Weiner died within a minute or two of being shot.

The PCRA court noted that trial counsel testified he was satisfied with Dr. German's time of death testimony. Had counsel challenged the time of death, the court stated, he would have opened up further attacks on Copenhefer's credibility concerning his whereabouts. The court concluded that this was a valid strategy and that counsel did not perform unreasonably. The Supreme Court of Pennsylvania also noted trial counsel's satisfaction with Dr. German's testimony as to the time of death. With respect to the lingering death

theory, the Court concluded that Copenhefer claimed only that his counsel performed unreasonably by failing to call an expert to "critically evaluate," in rebuttal, the Commonwealth's expert testimony, and that it would not consider counsel ineffective for failing to do so. *Copenhefer*, 719 A.2d at 254 n.12.

To succeed on his claim of ineffectiveness, Copenhefer was required to demonstrate that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error, the result would have been different. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (*citing Strickland v. Washington*, 466 U.S. 668, 687-96 (1984)). As to the first prong, there is a strong presumption that counsel's conduct was reasonable. *Id.*

The Report and Recommendation, adopted by the District Court, found reasonable the Supreme Court of Pennsylvania's conclusion that trial counsel's performance was not deficient. It noted that the PCRA testimony showed that counsel had sound reasons for not challenging Dr. German's testimony that Mrs. Weiner might have lingered before dying, and that counsel believed that Dr. German's testimony was beneficial to Copenhefer. It also concluded that, even if counsel's performance was deficient, Copenhefer could not show prejudice. Noting that uncontradicted evidence proved that Copenhefer killed Mrs. Weiner whether or not she lingered before dying, it concluded that even if trial counsel had challenged the theory that Mrs. Weiner lingered before dying, the result of the trial would have been the same.

We conclude that Copenhefer simply cannot show prejudice from this claim of ineffective assistance of counsel. We need not, therefore, determine whether trial counsel performed unreasonably by failing to anticipate that the Commonwealth would use the lingering death theory of one expert, Dr. German, while rejecting that expert's time of death, and also use the time of death of another expert, Dr. Kim, or that counsel failed, in the middle of a four-week trial, to find an expert to rebut the belatedly advanced "lingering death" theory.

Because the Supreme Court of Pennsylvania did not address the prejudice prong of the *Strickland* test, the District Court properly reviewed the issue *de novo*. *Holloway*, 355 F.3d at 718. To establish prejudice, Copenhefer was required to show a reasonable probability that, but for counsel's error, the result would have been different. *Strickland*, 466 U.S. at 687-96 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In light of the overwhelming evidence against Copenhefer, we agree with the District Court that he cannot show he was prejudiced.

Even if trial counsel had presented expert rebuttal testimony suggesting that it was not possible that Mrs. Weiner lingered before dying, the jury also had before it Dr. German's testimony to the contrary. Moreover, and as noted by the District Court, even if Mrs. Weiner did not linger before dying, it was still possible for Copenhefer to have shot her around 5 p.m. and then to have driven to his bookstore, arriving sometime after 5 p.m. Citing the testimony of three witnesses, Copenhefer argues that the lingering death theory was important because he had an alibi from 5 p.m. on and the experts put the earliest time of death at 5 p.m. But the testimony of these three witnesses does not, in fact, support a 5 p.m. alibi. When asked when she saw Copenhefer that afternoon, his wife testified "I can't give an exact time. Sometime between 5:00 and 6:00." App. 3862. When asked a similar question, she said "5:30, something like that." *Id.* at 3865. David Zimmer, a bank employee, testified that when he heard that Mrs. Weiner had been kidnapped, he left the bank's Erie branch at 5 p.m. and arrived in Corry around 6:30 or 7 p.m., and that Copenhefer was in the bookstore when he went by. Trooper Johnston testified that Copenhefer was at the bookstore at approximately 5 p.m., but admitted that that was not based on personal knowledge. Copenhefer ignores his own testimony that he arrived back at his bookstore around 5:20 p.m.

According to the 22-point plan found on his computer, Copenhefer intended to kidnap Mrs. Weiner, have her tape a message to her husband, and then kill her before leaving the bag with the ransom note and making the call to her husband. This timeline is consistent with the theory that Copenhefer

killed Mrs. Weiner early in the afternoon and that she lingered before dying later that evening. When questioned by the police, Copenhefer spoke openly about where he had been Friday evening through Sunday, but he refused to discuss his whereabouts on Friday afternoon. Moreover, and perhaps most importantly, Copenhefer told a detective that he had demonstrated to other inmates how to shoot a person in the head without severing the medulla so that the person "linger[s]" before dying. App. 3163-64. These pieces of evidence all support the theory that Copenhefer shot Mrs. Weiner in the early afternoon and that she, indeed, lingered before dying, perhaps as early as 5 p.m., as Dr. Kim had testified.

The evidence that Copenhefer committed the calculated kidnapping and murder of Mrs. Weiner, and did so alone, was overwhelming. The compelling evidence of guilt included the documents recovered from his computer, including the drafts of his call to Mrs. Weiner, the recorded call from Mrs. Weiner to her husband, the ransom note, the notes at the drop sites, and the 22-point plan. An FBI metallurgist testified that the rods found at the drop sites were made within minutes of those found in Copenhefer's backyard. The tears on the crepe paper found at a drop site matched the tear pattern on the roll found in his store. Copenhefer's fingerprints were found on notes at the drop sites, and a note in his wallet matched up with the plan on his computer.

We cannot say that Copenhefer has established any reasonable likelihood that the result would have been different even if trial counsel had been able to rebut the lingering-death theory. As the Magistrate Judge aptly noted, "Copenhefer seeks to make time of death the only issue in this case. To prove its case, the Commonwealth had to prove murder, not time of death. On this point, the Commonwealth made out an overwhelming case." App. 109. We will affirm the District Court's denial of the "lingering death" claim.

## 2. **The _J.E.B._ Claim**.

We also granted a certificate of appealability on Copenhefer's claim that the prosecution used peremptory

strikes to remove female jurors, in violation of *J.E.B.*, 511 U.S. 127. Copenhefer concedes, however, that under *Abu-Jamal v. Horn*, 520 F.3d 272, 284 (3d Cir. 2008), he cannot prevail because he is unable to show contemporaneous objections to the strikes that he believes violated equal protection, and that he simply wishes to preserve the claim for possible future review. We will, nonetheless, briefly address his claim on the merits. It resoundingly fails.

The *J.E.B.* claim was not presented to the Pennsylvania state courts. The District Court, however, properly reviewed the claim, as the Commonwealth had waived exhaustion. Because there was no adjudication on the merits in the state court, we, of course, are not concerned with an issue of AEDPA deference. *Holloway*, 355 F.3d at 718. The District Court denied the claim because it found that retroactive application of *J.E.B.* was barred by *Teague v. Lane*, 489 U.S. 288 (1989), an issue we need not and do not reach given Copenhefer's failure to have made even a *prima facie* showing that the Commonwealth exercised peremptory strikes on the basis of gender.

All relevant circumstances must be considered in determining whether a *prima facie* showing has been made. *Holloway*, 355 F.3d at 722. In *Holloway*, we cited five generally relevant factors: "1) the number of [female] members in the panel; 2) the nature of the crime; 3) the [gender] of the defendant; 4) a pattern of strikes against [females]; and 5) the questions and statements during the voir dire." *Id.* With respect to the first factor, Copenhefer states that twenty-eight of the sixty-one jurors who were individually questioned during voir dire were female. He does not make any argument as to how the nature of the crime affects the analysis, nor does he point to any disparate questioning or treatment of female jurors. He relies solely on the Commonwealth's alleged pattern of strikes.

In the District Court, Copenhefer set forth the percentage of female jurors struck by the prosecution (11 out of 20 or 55%) and the percentage of prosecution strikes used to strike female jurors (11 out of 19 or 58%). He computed some statistics using these numbers—there were, for example, 1.38 peremptory strikes of female jurors for every

strike of a male juror—but did not explain whether and how these statistics were significant. Moreover, the final composition of the jury was six females and nine males. The three alternates were male, so there was an equal number of each gender on the jury that actually deliberated. Before us, Copenhefer points to the striking of specific female jurors; however, in the District Court, he did not single out any female juror as being impermissibly struck.

The numbers presented by Copenhefer do not show a pattern of strikes on the basis of gender, nor do they raise an inference of discrimination. Simply put, Copenhefer has not shown that "there is some reason to believe that discrimination might be at work." *Johnson v. Love*, 40 F.3d 658, 663 (3d Cir. 1994) (*quoting United States v. Clemmons*, 892 F.2d 1153, 1156 (3d Cir. 1989)). Accordingly, we will affirm the District Court's denial of relief with respect to this claim.

## VI. Conclusion

With reference to the guilt phase of the trial, the Magistrate Judge concluded that although Copenhefer had raised a number of claims for relief, he had not demonstrated that his conviction was compromised by any federal constitutional violations, and that the Commonwealth had marshaled an overwhelming amount of evidence linking Copenhefer directly to the kidnapping and murder of Sally Weiner. The Magistrate Judge recommended that guilt-phase relief under 28 U.S.C. § 2254 be denied. The District Court adopted the Report and Recommendation as to the guilt phase claims.

The Magistrate Judge then reached the penalty phase claims, noting, at the outset, that it is "no part of the court's job to determine whether this sentencing hearing, or any state criminal proceeding, was 'ideal'; the court is charged only with scouring the trial record for federal constitutional errors that had a substantial and injurious effect on the jury's deliberations." App. 130. Having done so, the Magistrate Judge found that the record disclosed but one, the one we have addressed at some length, and recommended relief only as to that claim, thus effectively recommending a denial of

relief as to the sentencing claims that did not meet the requisite federal standard. Not surprisingly, Copenhefer took no issue with those recommendations, and the District Court adopted the Report and Recommendation as to the penalty phase claims. But whether decision on any remaining sentencing claims was implicitly denied or whether decision on any such claims was simply deferred, we have considered all of those claims, and conclude that they fail as a matter of law.[5]

---

[5] (I) Treating Copenhefer's factual allegations as true, counsel's penalty phase investigation into Copenhefer's personality disorder, paranoia, and head injury for the purpose of developing mitigating evidence and his performance at the penalty phase with reference thereto were not unreasonable. Counsel retained an expert who performed a mitigation investigation and diagnosed Copenhefer with Antisocial Personality Disorder. Counsel then made a strategic decision not to present that evidence. (II) & (IX) Copenhefer was not entitled to a jury instruction that he was not eligible for parole. *Simmons v. South Carolina*, 512 U.S. 154 (1994); *O'Dell v. Netherland*, 521 U.S. 151 (1997). (III) Counsel did, in fact, argue for an instruction that the jury must find Copenhefer's lack of a criminal record as a mitigating circumstance. Counsel was not ineffective for failing to object to the Commonwealth's argument that no mitigating evidence existed. The Commonwealth's actual argument was that there were "no *true* mitigating circumstances *of merit* in this particular case." App. 4489 (emphasis added). (V) The jury did not rely on non-statutory aggravating factors. *See* 42 Pa. C.S. § 9711(a)(2)(1989). To the extent that it did, the Eighth Amendment was not violated. *Barclay v. Florida*, 463 U.S. 939, 956 (1983); *Lesko v. Owens*, 881 F.2d 44, 57-59 (3d Cir. 1989). (VI) The trial court did not err in allowing the kidnapping of the victim to establish both aggravating circumstances. *Jones v. United States*, 527 U.S. 373, 398-400 (1999). (VII) Counsel for the Commonwealth did not engage in misconduct in his closing argument. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983); *Payne v. Tennessee*, 501 U.S. 808 (1991). (VIII) The Commonwealth did not violate *Brady v. Maryland*, 373 U.S. 83 (1963). (X) The Constitution does not require proportionality review,

For the reasons we have stated, we will reverse the order of the District Court to the extent that it granted Copenhefer relief from his sentence of death. In all other respects, we will affirm the judgment of the District Court.

---

*Pulley v. Harris*, 465 U.S. 37, 50-51 (1984), and Copenhefer has not shown that the state court did not undertake its review in good faith. *Riley v. Taylor,* 277 F.3d 261, 311-12 (3d Cir. 2001) (*citing Walton v. Arizona*, 497 U.S. 639, 656 (1990)). (XI) A disagreement between experts does not establish a claim that false and misleading testimony has been presented. (XIII) Counsel was not ineffective for failing to argue at sentencing that Copenhefer was not the sole perpetrator of the offense. The evidence is overwhelming that Copenhefer acted alone.

*Copenhefer v. Horn, et. al.*
Nos. 03-9000 & 03-9001

MCKEE, *Chief Judge*, concurring in part, and dissenting in part

I agree with the majority's conclusion that Copenhefer's challenge to his conviction is without merit. However, for the reasons that follow, I cannot agree that the District Court erred in overturning the death sentence that was imposed.

**I.**

It has long been held that the Eighth Amendment bars the arbitrary imposition of the death penalty. *Beard v. Banks*, 542 U.S. 406, 421 (2004). Because "death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (plurality opinion), the United States Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as humanly possible, that the sentence was not imposed out of whim, passion, prejudice, *or mistake*." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) (emphasis added). Indeed, there is "a considerable history reflecting the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual. Since the early days of the common law, the legal system has struggled to accommodate these twin objectives." *Id.* at 110.

Eighth Amendment jurisprudence therefore requires that the sentencer (as opposed to an appellate court) be permitted to consider any aspect of the defendant's record or character as a mitigating factor, and weigh it against any aggravating factors in determining whether the defendant should be put to death by the state. *Id*. at 117-18

1

(O'Connor, J., concurring). The "[s]entencer [must] be given a full opportunity to consider mitigating circumstances in capital cases. *Lockett v. Ohio*, 438 U.S. 586, 602 (1978). "Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (quoting *Eddings*, 455 U.S. at 114).

The reason is clear. "Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a reasoned *moral* response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (internal quotations omitted); *see also Eddings*, 455 U.S. at 112 ("the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death."). But mere "consideration" of mitigating evidence is insufficient to satisfy Eighth Amendment safeguards. The jury must also be able to "give effect to that evidence of mitigation." *Penry*, 492 U.S. at 319.

My colleagues quite correctly emphasize this point in discussing *Penry* and *Eddings* "to show how distinguishable they are on the facts from the case at hand." *See* Maj. Op. at 16. ("[t]he sentencer must be able to consider *and* [be able to] give effect to that evidence in imposing sentence.") (emphasis added). The majority's conclusion that those cases, along with *Buchanan v. Angelone*, amount to "game, set, and match" would be quite difficult to refute if Copenhefer's sole argument was that the trial court erred by

failing to instruct the jury on the legal effect of the stipulation that he had no prior record. Maj. Op. at 15; 522 U.S. 269, 272-73 (1998).

Copenhefer's argument, however, is not that narrow. Accordingly, we cannot so readily declare that *Buchanan* ends our inquiry. Copenhefer argues not only that the court's failure to define "stipulation" or inform the jury of its significance unconstitutionally precluded the jury from giving effect to evidence of mitigation, but also that the jury's failure to engage in the requisite balancing of mitigating and aggravating factors (because the jury found that no mitigating factors existed) resulted in the arbitrary imposition of the death penalty in violation of the Eighth Amendment. *See* Initial Brief at 14 ("Moreover, the jury's failure to find and weigh the stipulated mitigating fact rendered the death sentence arbitrary and capricious."). This latter point is the issue upon which this case primarily turns and, given the record here, it is a point that undermines the majority's reliance on *Buchanan*. On the contrary, under the bizarre circumstances of Copenhefer's penalty hearing, *Penry* and *Eddings* require that we affirm the District Court's order vacating the sentence of death, and *Buchanan* is not to the contrary.

## II.

As the majority explains in summarizing the underlying facts of this case, the prosecutor entered into a stipulation with defense counsel which established that Copenhefer had no prior criminal history. The court told the jury that the stipulation existed. Thus, not surprisingly, defense counsel quite naturally made the following argument during his summation at the close of the penalty phase of the trial:

3

> Now, with regards to the one mitigating circumstance, which we've already referred to, the fact that he has no prior convictions, [the prosecutor] stood up and stipulated to that, and I suggest to you that speaks for itself. In other words, we have established that clearly that mitigating circumstance exists. And that, therefore, you should take that directly into consideration in making your determinations.

App., p. 4471; *see also* Maj. Op. at 8.

However, for reasons known only to him, the prosecutor thought it appropriate to ignore that he had stipulated that a migrating factor existed. After defense counsel's closing, the prosecutor argued to the jury: "[Copenhefer] chose to do it on his own, in a conscious and deliberate and a calculated fashion, and that's why I submit ***there are no true mitigating circumstances of merit in this particular case***." App., p. 4489 (emphasis added).

No doubt sensing the problems that could arise from the prosecutor's remarks, the "trial court discussed [with counsel] whether it should . . . direct the jury to find as a matter of law that the stipulated fact Copenhefer had no prior record was a mitigating factor."[1] *See* Maj. Op. at 8. Not surprisingly, given the prosecutor's decision to ignore the stipulation and argue that no mitigating circumstance "of merit" existed, defense counsel asked the trial court to instruct the jurors that at least one mitigating factor had been proven as a matter of law. For reasons that are beyond my comprehension, the trial court refused. Instead, it gave the standard charge which is quoted by the Majority.

---

[1] It is not at all clear what a "*true* mitigating circumstance" or one of "merit" is since the mitigating factor that was stipulated to *is* a meritorious mitigating circumstance as a matter of law. It would have been appropriate to argue that that mitigating circumstance was outweighed by the evidence of aggravating circumstances here, but that is not what the prosecutor said; and it is apparent from subsequent events that that is not how the jury interpreted this troublesome – if not mischievous - argument.

4

Although my colleagues include the court's charge at some length in their opinion, I will reiterate portions of it in order to emphasize why the majority's analysis reaches the wrong conclusion.[2]

As the Majority points out, the trial judge instructed the jury that it was permitted to consider all mitigating circumstances. However, that was qualified by the instruction that Copenhefer "***must prove any mitigating circumstances [sic] only by a preponderance of the evidence***; that is, by the greater weight of the evidence." App., p. 004506 (emphasis added). At another point during the charge, the trial court instructed the jury:

> In this case, under the Sentencing Code, the following matters, ***if proven to your satisfaction by a preponderance of the evidence, can be mitigating circumstances***: First, the defendant has no significant history of prior criminal convictions; and, second, any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense.

App., p. 004507 (emphasis added).

The trial judge informed the jury a second time that "the defendant ***need only prove any mitigating circumstances by a preponderance of the evidence***." *Id*. at 004509 (emphasis added). The trial court also reiterated that the jury "may not refuse to consider any evidence in mitigation ***which has been proven to your satisfaction by a preponderance of the evidence***." *Id*. (emphasis added). Finally, the trial court told the jury to "consider

---

[2] In doing so, I in no way intend to suggest that the court emphasized any particular part of the charge through inflection or tone when it instructed the jury. Rather, as I explain below, I emphasize portions of the text only to highlight language that allowed the jury to ignore a mitigating circumstance that had been established as a matter of law.

the mitigating circumstances offered by the defendant.  [But the trial court clarified], [t]his does not mean that you must accept them as mitigating circumstances, ***for you shall only do that if one or more of you determines that those mitigating circumstances have been proven by a preponderance of the evidence***." *Id.* (emphasis added).[3]

Placed against this background and considered in the context required by this record, *Buchanan*, *Penry* and *Eddings* mandate that we uphold the District Court's thoughtful opinion and affirm its order vacating Copenhefer's sentence.  In *Buchanan,* the Supreme Court held that the trial court's failure to specifically inform the jury of certain statutorily prescribed mitigating circumstances did not invalidate the defendant's death sentence.  As my colleagues explain, the Court held that no constitutional rule required the court "to 'instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.'"

---

[3]  The majority also asserts that "[t]here were no objections to the instructions, nor any suggestions for correction or additions."  Maj. Op. at 9.  I cannot agree. Copenhefer's counsel argued for an instruction regarding the significance of the stipulation.  When prompted by the trial court, Copenhefer's counsel asserted:

> But it is a mitigating factor per se by the stipulation, it has been proven by that stipulation by a preponderance of the evidence.  In discussing the jury instructions yesterday, one of the things we said was if you find something by a preponderance of the evidence, you cannot ignore it, you cannot dismiss it.  And especially in light of this particular mitigating circumstance which is spelled out specifically in the Statute *[sic]*, it is a mitigating circumstance which has been proven.  Now, they can again decide it's not worth much weight, but they cannot ignore it.

Appx., p. 004503

6

*See* Maj. Op. at 14 (quoting *Buchanan*, 522 U.S. at 275). However, nothing in the Court's opinion suggests that the jury *ignored evidence* of a mitigating factor or that the Supreme Court would have upheld the results of a penalty hearing that allowed jurors to arbitrarily ignore mitigation that had been established as a matter of law. On the contrary, the Court explicitly declared "that the sentencer may not be precluded from considering, and *may not refuse to consider*, any constitutionally relevant mitigating evidence." *Buchanan*, 522 U.S. at 276 (emphasis added). The Court rejected the defendant's challenge to the jury charge in *Buchanan* precisely because the "jury instruction did not foreclose the jury's consideration of any mitigating evidence" 522 U.S. at 277, but it is clear from the language I have just quoted that nothing on the record in *Buchanan* suggested that the jury simply refused to consider evidence of mitigation.

I do not suggest that the jury here, in *Buchanan* or in any other case should attribute any particular weight to a mitigating fact that is proven. However, it is clear that the Eighth Amendment does not tolerate a sentencing phase of a capital trial where jurors plainly ignore mitigating evidence. As both the Court in *Penry* and majority in this case explain, "*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing [its] sentence." Maj. Op. at 15 (quoting *Penry*, 492 U.S. at 319).

More specifically, in *Penry*, the United States Supreme Court granted certiorari to resolve two questions. The question relevant to our inquiry was whether Penry:

7

was sentenced to death in violation of the Eighth Amendment because the jury was not adequately instructed to take into consideration all of his mitigating evidence and because the terms in the Texas special issues were not defined in such a way that the jury could consider and give effect to his mitigating evidence in answering them.

492 U.S. at 313. The Court found that the jury had been unable to give mitigating effect to evidence in imposing the sentence partly because the jury instructions failed to define "'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability." *Id*. at 323. The Court held that a reasonable juror may have thought Penry acted "deliberately" because he confessed. *Id*. at 322. But the Court noted that

>  personal culpability is not solely a function of a defendant's capacity to act 'deliberately.'. . . Because Penry was mentally retarded, . . . and thus less able than a normal adult to control his impulses or evaluate the consequences of his conduct, and because of his history of childhood abuse, that same juror could also conclude that Penry was less morally 'culpable than defendants who have no such excuse,' but who acted 'deliberately' as that term is commonly understood.

*Id*. at 322-3 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

For our purposes, it is important to note that the Court specifically stated that:

> it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that in imposing sentence. Only then can we can be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence.

8

*Id*. at 319 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304-5 (1976)).  The Court concluded: "[i]n the absence of jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence . . ..".  *Id*. at 323.

Thus, *Penry* recognizes that there are situations where the mere mention of "mitigating evidence" in a jury charge, or admitting evidence of mitigation, may not, by itself, be sufficient to guard against the arbitrary imposition of the death penalty.  This is such a case.

"Presentation of mitigating evidence alone, of course, does not guarantee that a jury will feel entitled to consider that evidence." *Boyde v. California*, 494 U.S. 370, 384 (1990).  As the Court explained in *Penry*: "the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration' in imposing [its] sentence." *Penry*, 492 U.S. at 321 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 185,199 (1988)).

### III.

My colleagues focus on the trial court's repetition of the role that evidence of mitigation can play at the penalty phase of a capital trial.  The Majority appears to rely on the portions of the trial court's instructions that told the jurors: (i) the jury "may consider as mitigating circumstances any circumstance [*sic*] which tends to justify the penalty of life imprisonment," Maj. Op. at 9; (ii) the "list of mitigating circumstances offered cannot limit your deliberations, since you are free to consider any aspect of the crime or of the

9

character of the defendant as mitigating in your sole discretion," *id*. at 10; (iii) the jury may consider "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense." *Id*. at 7.

The problem here is that (as the Majority quite correctly notes) we are bound by the jury's pronouncement that it imposed the death penalty because *no* mitigating circumstances were proven. *See* Maj. Op. at 13. The jury could not have come to that conclusion without ignoring evidence of mitigation that was an uncontested part of the record. I simply do not understand how we can be bound by the jury's explanation of why it imposed the death penalty and conclude anything other than that evidence of mitigation was ignored. The fact that there was obvious confusion when the verdict slip was handed to the judge does not allow us to spackle over the fact that the jury ignored evidence of a mitigating circumstance that the law required be considered and weighed against the aggravating circumstances. On the contrary, we should be especially reticent to allow a death sentence to stand given the confusion that is so apparent on this record.

The exchange between the court and jury foreperson at the penalty phase is as revealing as it is troubling.

> THE COURT: Ladies and gentlemen, I'm reviewing the verdict slip that you have provided for me. Let me just double check something. I think that I find there is an inconsistency on this, and I'm going to have to ask you to take a moment to go back and reconsider this. I'm dealing specifically with part 2 b, in which you must check off either one or two as it is applicable. You didn't check off either one of them. I think I understand which one it is, I don't know that it's necessary for you to leave the jury box. I'm going to return this to you, to the foreman so that he can look at that, and determine— and make a determination. Look carefully, if you feel that you

10

have to go back in the jury room, that will be perfectly fine. I would suggest before you do that, reread both one and two to make sure which one you're checking off so you feel satisfied on that.

(The verdict is handed to the foreman and returned back to the judge.)

THE FOREMAN: From my understanding, that's the way it should be, Your Honor.

THE COURT: All right. Having checked off two, you crossed out the one part.

THE FOREMAN: We had a list in there, Your Honor, I didn't know whether we should also list those.

THE COURT: Do I take it that should be in there then?

THE FOREMAN: No, it should not.

THE COURT: Well –

THE FOREMAN: We had a list that we dealt with with [*sic*], if you would like us –

THE COURT: I don't want you to go into that. If you do not have two down there, then logically—and I don't mean to suggest which is correct on this, but logically, you would be filling out number one, rather than two.

Give that back to the foreman.

(The verdict slip is returned to the foreman.)

THE FOREMAN: You're correct, Your Honor. Should I change it?

THE COURT: I would ask you then, if that is the case, whether you wish to consult with the other members of the jury or make the correction?

THE FOREMAN: No, I think we understand. Yes, I can make the change. There would be no problem.

THE COURT: All right.

THE FOREMAN: Do you want me to change it on this?

THE COURT: Yes. Thank you. Now you may leave that with the foreman.

Mr. Foreman, I understand from your submission of the verdict slip that you have reached a determination of sentence, is that correct?

THE FOREMAN: Yes, we have, Your Honor.

**THE COURT: And what is that sentence?**

**THE FOREMAN: Penalty of death.**

THE COURT: And on what basis?

THE FOREMAN: **On the basis of item number one, that there is at least one aggravating circumstance and mitigating—no mitigating circumstances.**

THE COURT: What did you find as the aggravating circumstance?

THE FOREMAN: That the victim was held for ransom, that there was felony kidnapping, it was planned, and ultimately, the victim did die.

THE COURT: Thank you. You may pick up the verdict slip. You may be seated, Mr. Foreman.

App., p. 4520-21 (emphasis added).

The jury was then polled and the jurors unanimously agreed that there were no mitigating circumstances to be considered.[4] Thus, I am not persuaded by the Majority's reliance on a line of cases which hold that the Eighth Amendment is not violated as long as jurors are allowed to consider and give effect to any mitigating circumstance that any juror believes is established by a preponderance of the evidence. Here, since the jury concluded that there were *no* mitigating circumstances, it is clear that the jurors ignored a mitigating circumstance that was established as a matter of law, and had to be considered. I can find no Supreme Court case upholding a death sentence under such circumstances.

The Majority attempts to squeeze the genie back into the *Buchanan* bottle by assuming that the foreman simply made a mistake in crossing out "first offense" on the verdict form. Maj. Op. at 10 (stating that "[t]he foreman crossed out 'first offense,' but mistakenly placed the check mark in the "weighing" box where, . . . it should not have been placed."). Such speculation would have merit had the foreman not explicitly stated that there were no mitigating factors, and the jury not unanimously agreed when polled immediately after hearing the foreman's explanation for this sentence. *See supra* at p. 12. I therefore have a hard time agreeing that the jury considered a fact no juror believed

---

[4] For ease of reference, I have attached the verdict slip. It is clear that whatever confusion existed regarding the verdict slip, ultimately, the changes made to the verdict slip reflect the pronouncement of the jury foreman (and that of each and every other juror) that no mitigating factor was found to exist but aggravating factors did exist and, therefore, death was mandatory.

13

existed.  My colleagues' contrary view reduces the time-honored tradition of polling a jury to nothing more than a ritualistic callisthenic.

We cannot both accept the jury's explanation and ignore it too by speculating around it.  If we accept what the jury unanimously declared, as the Majority says we must, it is clear that the jury ignored constitutionally relevant evidence.  Moreover, even if we could ignore the record and breathe some ambiguity into what happened here,  any doubt must be resolved in favor of life, not death.  *See Andres v. United States*, 333 U.S. 740, 752 (1948) ("In death cases doubts such as those presented here should be resolved in favor of the accused."); *Penry*, 492 U.S. at 328 ("Our reasoning in *Lockett* and *Eddings* thus compels a remand for resentencing so that we do not risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.  When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.") (internal citations and quotations omitted).

When the instructions are read in their entirety, it is clear that jurors believed they were permitted to consider any evidence of mitigation only ***after*** that evidence had been proven by a preponderance of the evidence.  That is what the judge told them and there is certainly nothing wrong with that statement of the law.  However, the prosecutor had decided to argue that there was no evidence of mitigation and the jury was never instructed about the effect of the stipulation between Copenhefer and the

Commonwealth.[5]  Thus, the court's failure to instruct on the significance of a stipulation allowed the jury to ignore evidence of mitigation *under these circumstances.*

Our Eighth Amendment inquiry must focus on "whether there is a reasonable likelihood that [this] jury . . . applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380.  This inquiry could not be easier because the jury said that it did precisely that.  Therefore, we should conclude that the instruction allowed the jury to ignore constitutionally relevant evidence that had been proven as a matter of law.  It did so by not informing the jury that the law regards a stipulated fact as proven after the prosecutor decided to argue the absence of any mitigation.  *See id*; *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 (2007) ("The jury must have a 'meaningful basis to consider the relevant mitigating qualities' of the defendant's proffered evidence.") (quoting *Johnson v. Texas*, 509 U.S. 350, 369 (1993)).

My colleagues attempt to rationalize this paradoxical penalty hearing by assuming that this jury would have imposed the death penalty anyway and merely did what it intended.  They reason that "the record strongly suggests that [the jury] considered the mitigating evidence and decided that none of that evidence was qualitatively sufficient to

---

[5]  Over Copenhefer's objection, the trial court found that it could not compel the jury to find the stipulated fact as a mitigating factor though it admitted it would be problematic if the jury refused to find the existence of a mitigating factor based on the stipulation. Appx., p. 004504 (The Court: "[T]he stipulation  does not mean that the jury must accept it.  I anticipate they will, of course, but I don't think I can compel they accept it as being something that they must put down as a mitigating factor. [Defense Counsel]:  That's fine.  In fact, [if] the verdict of death comes back, and there's an indication that they haven't accepted that, then we have a whole new problem.  The Court:  Then we have a problem, I agree with you.").

constitute a mitigating circumstance." Maj. Op. at 17. However, there is a difference between deciding that evidence is not sufficient to constitute a mitigating circumstance and deciding that there is *no evidence* of mitigation. The distinction is far more than a linguistic complexity; it is a distinction with a constitutional difference.

My colleagues also believe that "it is difficult [to] imagine that the outcome of this case would have been different if the jury had been specifically instructed to find Copenhefer's lack of a prior record was a mitigating circumstance." *Id*. at 18. Perhaps, but the solemnity and finality of the death penalty should not afford the luxury of such harmless error speculation. "[W]e may not speculate as to whether the [sentencer] actually considered all of the mitigating factors and found them insufficient to offset the aggravating circumstances . . .. [Instead we are required to] remove any legitimate basis for finding ambiguity concerning the factors actually considered by the [sentencer]." *Eddings*, 455 U.S. at 119 (O'Connor, J., concurring). The Majority's speculation is particularly dangerous because it ignores the jury's own explanation of its sentence.[6] Moreover, the majority's hypothesis is no more likely than the possibility that at least one

---

[6] This case is unlike *Mills v. Maryland*, 486 U.S. 367, 381 (1988). There, the Court stated that "[t]here is, of course, no extrinsic evidence of what the jury in this case actually thought. . . ." Here, the jury told the judge what it thought. Since no mitigating factor existed, and there was evidence of several aggravating factors, the death sentence had to be imposed. In *Mills*, the Court set a death sentence aside explaining: "Our reading of [the judge's instruction and verdict form] leads us to conclude that there is at least a substantial risk that the jury was misinformed."; *see also Eddings*, 455 U.S. at 119 (O'Connor, J., concurring). Here, that risk is a certainty.

16

juror would have been unwilling to have Copenhefer killed for his first criminal offense no matter how wanton his conduct was.[7]

The majority's hypothesis about what happened here is little more than restorative speculation that attempts to re-write this confused record. However, despite the obvious confusion, some incontrovertible facts remain. The prosecutor, after stipulating to the existence of a mitigating factor, argued that the defendant should be put to death because there were no mitigating factors "of merit" on the record; the trial court then sat by and refused to explain to the jury that one mitigating factor had been established as a matter of law – and was therefore "of merit" and had to be considered; instead, the trial court told the jurors that they *must* weigh any mitigating factors *that were proven*. The jurors then imposed the death penalty based upon their unanimous conclusion that, contrary to stipulated evidence, no mitigating factors had been proven.

Unless we take it upon ourselves to completely ignore the verdict slip and the jury's unanimous explanation for sentencing Copenhefer to be executed, we must conclude that the jury either ignored the jury instruction and refused to find evidence of mitigation despite the court's charge, or that the jury accepted the charge but took it upon itself to ignore a proven fact that the law required be weighed in determining the sentence. It does not matter which of these two possibilities occurred here because one is

---

[7] We must be *confident* that the trial court's instruction did not "foreclose the jury's consideration of any mitigating evidence." *Buchanan*, 522 U.S. at 277. I can have no such confidence on this record. It is one that should remind us all that "[e]volving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case." *Mills*, 486 U.S. at 384.

as arbitrary and constitutionally improper as the other. As I stated at the outset, "[t]he sentencer may not refuse to consider . . . any relevant mitigating evidence." *Eddings*, 455 U.S. at 114.

**IV.**

I do not want to conclude without acknowledging that it may well be that the jury imposed this sentence because the jurors wanted Copenhefer to pay for his crime with his own life, just as my colleagues speculate. Given the circumstances here, the jury could certainly have reached that conclusion after properly considering all of the evidence of his guilt, the aggravated circumstances of his crime, and weighing them in a rational manner against the evidence of mitigation. However, the Eighth Amendment does not allow a jury to ignore evidence of mitigation and sentence someone to death just because the jury thinks that he deserves to die. Yet, according to the record, that is what happened here. In upholding the death penalty on this record, we are not only assuming the role of the circus hand who walks behind the elephant with a shovel, we are establishing precedent that will surely undermine the very significant legal protections that polling the jury is supposed to afford the accused.[8]

Imposing the death sentence without considering evidence of mitigation is precisely the arbitrary result the Eighth Amendment guarantees against. *See Mills*, 486 U.S. at 375 ("[F]ailure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett* . . . .") (internal citations

---

[8] *See United States v. Gibbs*, 813 F.2d 596, 603(3rd Cir. 1986) (Aldisert, J., dissenting) (alluding to the court being "the circus hand following the . . . elephant around the sawdust trail.").

omitted).  The jury charge that was given would not have resulted in an unconstitutional sentence if the jury concluded that there was evidence of mitigation but then proceeded to give it insufficient weight to counterbalance the aggravating factors of the crime.  *See Eddings,* 455 U.S. at 114-15 ("The sentencer . . .  may determine the weight to be given relevant mitigating evidence.  But [the sentencer] may not give it no weight by excluding such evidence from [its] consideration.").  However, that is not what the jury said it did; we cannot change that.

## V. CONCLUSION.

In arguing that this death sentence cannot be supported on this record I do not, of course, ignore or minimize the barbarity of Copenhefer's crime or the overwhelming evidence of his guilt.  Much has been said and written about the dangers of executing an innocent defendant; this is not such a case.  Having served on this court for nearly 20 years, and having presided over hundreds of homicide trials as a state trial judge for more than 10 years - 3 of which consisted of nothing but homicide trials -  I can truthfully say that I cannot recall a case where the evidence against a defendant was stronger than the evidence the Commonwealth marshaled against Copenhefer.  He is clearly guilty; but, of course, that is not the issue in this case.

It is precisely those crimes that most disgust us that most require we remain vigilant in deciding issues that arise under the Eighth Amendment's protection against arbitrary punishment.  Those are the crimes that pose the greatest danger that jurors will allow reason to be supplanted by passion.  "Arbitrary" sentences also include sentences imposed in violation of the law, and that is what the Eighth Amendment prohibits.

19

Because it is clear that the sentencing here was in violation of the Eighth Amendment's guarantee against the arbitrary imposition of the death penalty, we should affirm the District Court's order vacating this death sentence. *See Mills*, 486 U.S. at 384.

```
COMMONWEALTH OF PENNSYLVANIA    :    IN THE COURT OF COMMON PLEAS
                                :
            VS.                 :    OF ERIE COUNTY, PENNSYLVANIA
                                :       CRIMINAL DIVISION
DAVID C. COPENHEFER             :    NO.   1325  A  &  B  OF 1988
```

## VERDICT SLIP

### I.  GENERAL INSTRUCTIONS

A.  READ THROUGH THE ENTIRE VERDICT SLIP BEFORE BEGINNING DELIBERATIONS.

B.  AGGRAVATING AND MITIGATING CIRCUMSTANCES PRESENTED TO THE JURY.

1.  The following aggravating circumstances are submitted to the jury and must be proven by the Commonwealth beyond a reasonable doubt.

1.  The victim was held by the defendant for ransom or reward;

2.  The defendant committed the killing while in the perpetration of a felony.

2.  The following mitigating circumstances are submitted to the jury and must be proven by the defendant by a preponderance of the evidence:

1.  The defendant has no significant history of prior criminal convictions.

2.  Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

21

C.    DO NOT COMPLETE THIS SENTENCING VERDICT SLIP UNTIL YOUR

DELIBERATIONS ARE CONCLUDED.  THIS SENTENCING VERDICT SLIP IS

ONLY TO BE USED TO RECORD YOUR SENTENCING VERDICT AND THE

FINDINGS UPON WHICH IT IS BASED.


D.    IF, AFTER SUFFICIENT DELIBERATION, YOU CANNOT UNANIMOUSLY
REACH A VERDICT, DO NOT COMPLETE OR SIGN THIS SLIP, BUT RETURN
IT TO THE JUDGE.  THE JUDGE WILL DETERMINE IF FURTHER
DELIBERATIONS ARE REQUIRED; IF THEY ARE NOT, THE JUDGE WILL
SENTENCE THE DEFENDANT TO LIFE IMPRISONMENT.


PART II  -  SENTENCING VERDICT AND FINDINGS


If you have reached unanimous verdict, complete this part of the
form.

        In Section A, indicate whether the sentencing verdict is
death or life imprisonment.  If the sentence is death, indicate
the basis for that verdict by completing Section B.  If the
sentence is life imprisonment, indicate the basis for that
verdict by completing Section C.


A.  We, the jury, unanimously sentence the defendant to (check
one):

    _____✓_____        Death

    _____        Life Imprisonment

B.    The findings on which the sentence of death is based are
(check one):

    ✓    1.    At least one aggravating circumstance and
              no mitigating circumstance.

              The aggravating circumstance(s) unanimously
              found (is) (are):

_____

_____


22

_____ 2. One or more aggravating circumstances which outweigh(s) any mitigating circumstance(s).

The aggravating circumstance(s) unanimously found (is) (are):

_VICTIM HELD FOR RANSOM_

_FELONY -KIDNAPPING_

_PLANNED_

_VICTIMS DEATH_

The mitigating circumstance(s) found by one or more of us (is) (are):

~~FIRST OFFENSE~~

C. The findings on which the sentence of life imprisonment is based are (check one):

_____ 1. No aggravating circumstance exists.

_____ 2. The mitigating circumstance(s) (is) (are) not outweighed by the aggravating circumstance(s).

The mitigating circumstance(s) found by one or more of us (is) (are):

23